Filed 6/24/24  P. v. Fink CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DAVID MARK FINK,<br><br>     Defendant and Appellant. | B317362<br><br>(Los Angeles County<br>Super. Ct. No. BA435472) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Mildred Escobedo, Larry P. Fidler, and Henry J. Hall, Judges.  Affirmed in part, and vacated and remanded in part.

Mary Jo Strnad; Aaron J. Schechter, under appointments by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Susan S. Kim, Deputy Attorney General, for Plaintiff and Respondent.

David Mark Fink appeals from convictions for obtaining money by false pretenses, offering false instruments, identity theft, grand theft, and attempted grand theft. His convictions were based on a criminal scheme spanning several years in which Fink sent numerous writs of execution to sheriff's departments throughout California to fraudulently obtain and execute on monetary judgments in civil cases. Fink challenges his convictions and sentence.

Fink argues the trial court improperly revoked his self represented (pro per) status and abused its discretion when it refused to dismiss the case for a violation of his right to a speedy trial after his trial was delayed because of the COVID-19 pandemic. Fink also seeks appellate review of the trial court's proceedings on and subsequent denial of his motion under *People v. Pitchess* (1974) 11 Cal.3d 531 (*Pitchess*), for discovery of the personnel records of the sheriff's deputy who led the investigation of his crimes. In addition, he complains there was insufficient evidence to support 16 of his convictions for violating Penal Code[1] section 532 (theft by false pretenses).

With respect to sentencing, Fink asserts the trial court erred in ordering victim restitution on two counts, for which the undisputed evidence showed the stolen funds were returned to the victims. Moreover, he argues that his sentences on various counts and enhancements must be vacated in light of recent amendments to sections 654, 1170, subdivision (b)(6), and 186.11.

Only Fink's complaints about his sentence have merit. We affirm the judgment in all other respects.

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    *Fink's Scheme To Collect on Small Claims Judgments*

Fink has prior convictions for burglary, identity theft, forgery, and other financial fraud crimes in multiple separate cases, including one involving conduct similar to this case.

Fink's current convictions are based on a scheme of collecting on judgments using false or forged legal documents to make it appear that small claims judgment creditors had assigned those judgments to him.

At trial, the evidence showed Fink carried out this scheme using shell corporate entities (USJRU, Inc. and CollectionUSA) and false and stolen identities and aliases (David Carter, David Anderson, and David Jones).  Using his aliases, Fink set up mailbox accounts for his fictitious companies and falsified notary stamps to create computer-generated "assignments" to USJRU or CollectionUSA of small claims judgments entered against large companies like AT&T, Wells Fargo, JCPenney, and Best Buy. Fink also created fraudulent writs of execution, which he forwarded to sheriff's departments across California.  Acting on the writs, the sheriffs either levied funds from the judgment debtor's bank or, in some cases, conducted a "till tap" by seizing cash at the judgment debtor's place of business.  The collected funds were transmitted to the county, which in turn, acting on instructions from Fink, would send the funds to bank accounts in Idaho that Fink had opened.

---

[2]    The facts and procedural history are summarized here to provide context.  Elsewhere in the opinion, the facts relevant to each issue are described in detail.

3

B.     *The Discovery of Fink's Crimes, and Fink's Arrest*

In January 2015, Deputy Chief Sarkis Ohannessian of the San Bernardino County Sheriff's Department (SBSD) worked in the court services division, which processed levies and enforced civil writs of execution. Through an investigation of SBSD's files, Ohannessian discovered several writs submitted by individuals named David Carter or David Anderson that he suspected were fraudulent or forged based on anomalous party names, dates, and information, as compared to the respective court minutes. He discovered that each of these suspicious writs arose from a small claims case where a judgment had been entered for or assigned to someone other than Fink, and no writ had ever been issued to Fink, his aliases, or his shell companies.

Ohannessian also investigated USJRU, discovering it had a mailbox that was leased by David Anderson, using an Ohio driver's license. Ohannessian learned USJRU's mail was forwarded from the mailbox to three places in Idaho, and that David Anderson's mail was forwarded from a separate Los Angeles mailbox to an Idaho post office. The postmaster in Idaho was familiar with a "David Anderson," knowing him as someone who frequented the post office to get his mail. The postmaster identified Fink as David Anderson.

In March 2015, Idaho authorities placed Fink under surveillance and then arrested him.[3] They later seized computer

---

[3]     Idaho authorities arrested Fink for providing false information. When first approached, Fink provided an Ohio driver's license and identified himself as David Anderson. Authorities learned Fink's car was also registered to David Anderson. A search of the car revealed a wallet with David Anderson's Ohio driver's license and bank cards with the name of

4

hard drives, USB drives, cell phones, and other evidence after executing a search warrant at Fink's residence. Authorities also searched the physical and electronic files of USJRU. They collected evidence, including fake identification cards, bank cards, and driver's licenses with Fink's picture and the names David Carter and David Anderson. Ohannessian determined the names David Carter, David Anderson, and David Jones were Fink's aliases.

### C. *Trial Proceedings*

#### 1. *The charges*

On January 6, 2017, an information charged Fink with (1) 28 counts of obtaining money, labor, or property by false pretenses, in violation of section 532, subdivision (a) (counts 1-4, 9-12, 15, 18-23, 27, 30, 35, 41-42, 45-47, 50, 53-56); (2) 18 counts of procuring or offering a false or forged instrument, in violation of section 115, subdivision (a) (counts 5, 7, 13, 16, 24, 28, 31, 33, 36, 38, 43, 48, 51, 58-62); (3) 13 counts of identity theft, in violation of section 530.5, subdivision (a) (counts 6, 8, 14, 17, 25, 29, 32, 34, 37, 39, 44, 49, 52); (4) one count of grand theft of personal property, in violation of section 487, subdivision (a) (count 57); and (5) one count of attempted grand theft, in violation of sections 664 and 487, subdivision (a) (count 63).[4]

The information also contained four special allegations. First, it alleged that, under section 186.11, subdivision (a)(3), the

---

David Anderson or USJRU or both. A search of the name "David Anderson" in a national database of driver's licenses revealed the photograph did not match Fink's picture on the driver's license.

[4] There was no count 26 or count 40 in the information.

5

offenses in counts 1 through 25, 27 through 39, and 41 through 57 were related felonies involving fraud, embezzlement, a pattern of related felony conduct, and the taking of more than $100,000. Second, it alleged that, prior to the commission of the offenses in counts 1 through 25, 27 through 39, and 41 through 57, Fink had been convicted of three serious or violent felonies and thus was subject to sentencing under the three strikes law (§§ 667, subds. (b)-(j), 1170.12). Third, it alleged that, in the commission of the offenses in counts 1 through 4, 9 through 12, 15, 18 through 23, 27, 30, 35, 41 through 42, 45 through 47, 50, and 53 through 57, Fink took, damaged, and destroyed property worth more than $65,000, within the meaning of section 12022.6, subdivision (a)(1). Fourth, it alleged that the offenses in counts 1 through 4, 9 through 12, 15, 18 through 23, 27, 30, 35, 41 through 42, 45 through 47, 50, and 53 through 57 were thefts of over $100,000, within the meaning of section 1203.045, subdivision (a).

On October 19, 2018, Fink pleaded not guilty to all charges.

### 2. *Pretrial proceedings*

From his first appearance in September 2018 through the end of October 2020, Fink represented himself, with attorneys appointed as his standby or advisory counsel. In pretrial hearings, Fink cross-examined witnesses, presented evidence, and filed motions, including a *Pitchess* motion and motions to disqualify the judge. The trial court repeatedly admonished Fink for improper questioning of witnesses, misrepresenting the evidence and law, and delaying and disrupting the proceedings. After several warnings, the court terminated Fink's pro per

status.[5] The court then appointed Fink's advisory counsel to represent him.

From his first appearance in September 2018 through mid-March 2020, Fink waived his right to a speedy trial (commonly referred to as "waiving time"), requested continuances, and acquiesced to various continuances without objection. However, from March 2020 through the fall of 2021, Fink's case was continued because of orders issued by the Chief Justice of California and the presiding judge of the Los Angeles County Superior Court (LASC) in response to the COVID-19 pandemic. In July 2020, Fink withdrew his general time waiver. After that, with one exception, Fink refused to waive time,[6] objected to the continuance of the trial, and twice moved to dismiss his case for violation of his speedy trial rights. The court denied his motions and overruled his objections.[7]

---

[5] Judge Larry P. Fidler revoked Fink's pro per status at a hearing on November 4, 2020.

[6] Fink waived time at a hearing in February 2020, during which the court considered his request for modification of the terms of his electronic monitoring to allow him to visit his father and sister.

[7] Judge Fidler denied Fink's first motion to dismiss on July 17, 2020. Judge Mildred Escobedo denied Fink's second motion on October 22, 2021.

### 3. *The trial*

On October 27, 2021, Fink waived his right to a jury trial and proceeded by way of a bench trial. The trial began the next day.[8]

The prosecution presented testimony from Ohannessian, California Department of Justice investigators, and Idaho law enforcement officers about their investigations of Fink's scheme and the cases from across California in which Fink used false or forged documents to obtain writs of execution and collect small claims judgments. The prosecution also presented the testimony of victims who had obtained a judgment in a small claims case but had not assigned the judgment to Fink, USJRU, CollectionUSA, David Carter, David Anderson, or David Jones. In addition, the prosecution presented evidence from notaries who testified that, without their knowledge or authorization, Fink's aliases and shell companies had used their notary stamps or names to notarize false documents.

Forensic data experts and computer forensic examiners testified that they analyzed the computer hard drives, USB drives, cell phones, and other evidence seized from Fink's home in Idaho. They testified that Fink's hard drives contained documents with case names and other information associated with the victims' cases.

The prosecution also presented financial evidence and bank records. The evidence showed payments corresponding to those collected by the sheriff's departments that were sent to USJRU and made payable to USJRU or David Anderson to satisfy judgments in numerous small claims cases. The evidence also

---

[8] Judge Henry J. Hall presided over Fink's trial and sentencing.

showed the total amount Fink took from victims exceeded $100,000. However, not all the funds collected by the sheriff's departments were sent to Fink. In some cases, even though the sheriff executed the writ and collected the funds from the judgment debtor, the debtor or a county employee discovered the writ was invalid and stopped the payment before it was sent to USJRU. In another instance, Fink (posing as David Anderson) directed the county to return the funds to the debtor.

### 4.    *The convictions, sentences, and appeal*

On November 18, 2021, the court found Fink guilty on counts 1 through 5, count 7, counts 9 through 25, counts 28 through 39, counts 41 through 43, and counts 45 through 63. The court found true the allegations under sections 186.11 and 12022.6. The court dismissed counts 6, 8, 27, and 44 on the prosecution's motion.

Fink admitted the prior strike allegation based on a 1983 conviction, and the trial court found the allegation true.

On December 16, 2021, the court sentenced Fink to a total state prison term of 40 years four months, as follows:[9]

(1) five years on count 16 (the middle term of two years, doubled under the three strikes law, plus a one-year enhancement under sections 186.11 and 12022.6, subdivision (a)(1));

---

[9]    Although the court stated Fink's total sentence was 40 years four months, the sentencing transcript shows the court imposed individual sentences that instead total 41 years. Notwithstanding this discrepancy, because we are vacating Fink's sentence and remanding for a full resentencing hearing, the court will be able to revisit all its prior sentencing decisions.

9

(2) a consecutive term of 16 months on each of counts 1, 3, 4, 10, 15, 18, 19, 20, 21, 23, 35, 41, 50, 55, and 59 (one-third the middle term of 24 months, doubled to 16 months under the three strikes law);

(3) a consecutive term of eight months on each of counts 2, 5, 7, 11, 12, 13, 22, 24, 28, 31, 33, 36, 38, 42, 43, 46, 47, 48, 51, 56, 58, 60, 61, and 62 (one-third the middle term of 24 months);[10]

(4) a term of two years on each of counts 9, 14, 17, 25, 29, 30, 32, 34, 37, 39, 45, 49, 52, 53, 54, and 57 (the middle term), and stayed the execution under section 654, with the stay to become permanent upon the completion of the sentence for count 16; and

(5) a term of one year on count 63 (the middle term), and stayed the execution under section 654, with the stay to become permanent upon the completion of the sentence for count 16.

Fink received a total of 4,866 days of presentence custody credit, consisting of 2,433 actual days and 2,433 good time or work time days.

The trial court ordered Fink to pay victim restitution as follows: $22,930.23 to Best Buy, $3,782 to Staples, $9,269.27 to Volvo, $9,196.82 to Jack in the Box, $8,243.73 to PacBell, $10,031.18 to Bridgestone, $14,916.71 to Unified Parking, $4,948.60 to Toys [R] Us, $9,680.97 to El Pollo Loco, $6,538.61 to Sears, and $2,343.61 to California Parking Systems.

Fink timely appealed.

---

[10] The court exercised its discretion to dismiss the strike allegation for each of these counts because there was no actual gain to Fink or loss to the victim.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion When It Revoked Fink's Pro Per Status*

1. *Factual background*

a. *The court grants Fink's motion to represent himself and advises Fink that he will be held to the same standards as an attorney; Fink represents himself with the aid of standby and advisory counsel*

At the felony arraignment hearing on March 26, 2018, before Judge Deborah Brazil, Fink asserted his Sixth and Fourteenth Amendment right under *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525] (*Faretta*) to represent himself. The court required Fink to complete a waiver of counsel form (commonly referred to as a *Faretta* waiver) to ensure Fink understood the dangers and consequences of self-representation. The court advised Fink that self-representation was almost always an unwise choice and would not work to his advantage. The court explained further that Fink would not be helped or treated with special leniency by the court or the prosecutor, that he would be held to the same standards of conduct as an attorney, and that he would not be able to claim later that he made a mistake or that he received ineffective assistance of counsel.

With the aid of standby and advisory counsel, Fink represented himself for several years before trial. In pro per, Fink appeared before judges and filed pretrial motions.

11

b.    *Fink claims the court deceived him in order to get him to waive his speedy trial rights*

On July 7, 2020, Fink filed a motion to dismiss based on a violation of his speedy trial rights.  Therein, Fink asserted, without any evidentiary support, that the trial court had "held secret hearings—absent notice nor opportunity to be heard—continuing the case using illegal boilerplate Covid-19 language; that violated Defendant's right to have his dispositive pretrial issues decided by his speedy trial. [¶] The Covid-19 pandemic is not a license for courts to holiday while citizens wrongly jailed languish in squallor [*sic*]."

On July 17, 2020, the court (Judge Larry P. Fidler) held a hearing on Fink's motion to dismiss.  During the hearing, Fink repeated his unsupported assertion that, before any state or local emergency order had been issued, the court deceived him into agreeing to a 120-day general time waiver based on its knowledge that all court proceedings would soon be suspended because of the COVID-19 pandemic.  Specifically, Fink asserted:  "If there hadn't been a waiver, it would have been—have expired April 11[, 2020].  And your honor came to me with a 120-day waiver.  Your honor knew what was going on.  You knew that the order was coming down.  I didn't know that.  You asked me about a 120-day waiver.  You never asked me for a 120-day waiver because [*sic*].  You knew what was going on.  You didn't inform me that, hey, we probably won't even have the hearing in May."  The court rejected his assertion, explaining to Fink that, at the time it accepted his time waiver, the court had no information beyond what it had shared with him; that the Chief Justice of California, with whom the court did not have direct interactions, subsequently issued a statewide emergency order suspending all jury trials because of

12

the pandemic; and that subsequently the LASC supervising judge informed the court of the emergency order, after which the court provided notice to the parties accordingly.

>               c.      *Pretrial litigation concerning recorded jail calls*

While Fink was in pro per, law enforcement recorded a number of Fink's jail calls with his investigator. In November 2016, Fink filed an administrative complaint against Ohannessian based on Ohannessian listening to the jail calls. The prosecutor brought the issue to the trial court's attention and requested that the court conduct an in-camera review of the recorded calls. After conducting an in-camera review, the court ordered that all recordings be provided to the defense and then deleted from the prosecution's and SBSD's records.

Thereafter, Fink filed several motions related to the monitoring of his jail calls: motion to recuse the prosecution team and the Attorney General's Office; motion to dismiss the information for intrusion into Sixth Amendment privilege; and motion for legal remedy for stolen defense strategy. The court held an evidentiary hearing on Fink's motions over several days: July 17, 2020; August 5, 6, and 20, 2020; September 10, 2020; and October 15 and 30, 2020.[11] It was at the end of these proceedings, on October 30, 2020, that the court informed Fink it would be revoking his pro per status. On November 4, 2020, the court revoked Fink's pro per status.

---

[11] Judge Fidler presided over the evidentiary hearing.

13

During the evidentiary hearing on July 17, 2020, Fink claimed that the prosecution improperly withheld or destroyed evidence, specifically 80 maps that purportedly showed the location of his cell phone calls. However, when questioned about the 80 maps, Ohannessian explained that only one map of calls existed and that it had been produced to Fink. The court ruled that the prosecution had complied with Fink's discovery requests and that there was no evidence to support Fink's belief about the destruction or withholding of 80 maps. However, even after the court's ruling, Fink continued to refer to "80 maps" in his questions to various witnesses. As a result, the court directed Fink to stop referring to evidence that the witness testified did not exist because it misstated the evidence and made a "mess" of the record. Even after the court issued its warning, Fink continued to refer to "80 maps," and again, the court directed Fink to stop referring to that evidence.

Fink also claimed that Ohannessian improperly redacted information from a document. However, several witnesses testified that no information had been deleted from the document. Notwithstanding this testimony, Fink continued to ask questions that assumed the document had been altered, and again the court cautioned Fink that his questions assumed facts for which there was no factual basis.

Ohannessian testified that while listening to Fink's jail calls, he came across one call between Fink and an attorney's office, and that he stopped listening to the call after the woman

who answered the call said, "Law Office."[12]  Fink later asked Ohannessian, "So you didn't tell the court[13] that you had listened to a call between me and my attorney?"  This prompted the court to admonish Fink that he was misstating the record.[14]

Fink also misrepresented the record when he claimed that the trial court had previously made a factual finding that emails between the investigators in Idaho and California disclosed information showing they had improperly monitored his jail calls and thus discovered his trial strategy.  Fink insisted the court had made the finding on the record.  However, the court did not believe it had made such a ruling, and a review of the transcript revealed the court had not made that finding about the emails.  Ultimately, Fink conceded the "finding" was not based on the record but instead on his personal notes.

e.    *The August 5, 6, and 20, 2020 proceedings*

On August 5, 2020, during his examination of Ohannessian, Fink again asked about the call to his former attorney's office, "So at the last hearing you testified that you listened to [my attorney's] phone call, my former attorney, while I was on hold.  And you testified as soon as she said 'law office' you

---

[12]    Ohannessian testified that he subsequently notified the jail that the phone number needed to be blocked from being recorded since it belonged to an attorney's office.

[13]    Fink was referring to the judge in San Bernardino County who had signed the jail calls destruction order.

[14]    The court also told Fink, "You're either trying to mislead me or mislead someone who is going to review this record, and I'm not going to stand for it."

15

hung up. Is that correct?" Ohannessian responded that Fink was misstating the testimony and again reiterated, "as soon as it says 'law office' and you're asking for the attorney, I hung up." Fink persisted, "If we had the audio of that call, we would know exactly what you listened to." Later, after Ohannessian had responded to one of Fink's questions, Fink told Ohannessian, "You didn't answer my question." The court told Fink that Ohannessian had answered his question and admonished Fink that he was arguing with the witness "because [the witness] is not saying what you want him to say."

On August 6, 2020, while questioning Ohannessian, Fink expressed his view that SBSD had destroyed evidence of the records of his jail calls. Specifically, Fink stated after Ohannessian responded to one of his questions about emails produced to Fink in discovery, "Not the ones from [the San Bernardino County jail official] destroying the evidence with [the jail phone system provider]." The court admonished Fink to refrain from making claims for which he had no evidence because it caused the record to be "so muddled."

On August 20, 2020, Fink claimed that documents he received in discovery[15] showed the prosecution was trying to stop internal affairs from "charging Captain Ohannessian." The court

---

[15] Fink was referring to a 2016 motion filed by the prosecutor asking the court to conduct an in-camera review of recorded jail calls. At the time, Fink was represented by counsel. The prosecutor told the court on August 20, 2020, that Fink would have received a copy of the motion in 2016 when it was filed. Fink acknowledged that he was represented by counsel when the motion was filed, but noted he did not find the motion in his former counsel's file. The proof of service reflects that the prosecutor served the motion on Fink's then-counsel.

16

admonished Fink, "You have determined that they were trying to protect Ohannessian. I don't hear [*sic*] that in that letter. I'm sorry. That's not what it sounds like." Later on during the hearing, Fink repeated the assertion that the prosecutor wrote a letter to internal affairs to stop them from seeking charges against Ohannessian.[16] The court again admonished Fink, "You're making statements that you don't have any proof of. You've got to stop doing that." The court told Fink he was creating a record that is "full of confusion." The court added, "Stop making statements that you just make up in your own mind. Stop it. I'm ordering you to do that right now." Later on during the hearing, the court told Fink that his case would be harmed in the eyes of the jury if he was constantly being admonished by the judge. The court added, "I understand that this is very meaningful to you. If you're going to represent yourself, you've got to figure out how to do it without violating the rules of court."

---

[16] The letter that Fink was referring to is a letter dated November 3, 2016, from the prosecutor to Ohannessian and to an SBSD sergeant. The prosecutor had attached the letter as an exhibit to the 2016 motion asking the court to conduct an in-camera review of Fink's recorded jail calls. In the letter, the prosecutor wrote that calls between a pro per defendant and his investigator "are protected by the attorney work product privilege. Therefore, such phone calls should not be listened to." The prosecutor concluded by stating SBSD should not use any of the information received as a result of listening to the jail calls to conduct further investigation.

### f. *September 10, 2020 proceedings*

On September 10, 2020, during his examination of investigators about the seizure of his personal property when he was in custody in Idaho, Fink interjected by correcting the witnesses' testimony and adding his own contrary facts about when he was booked into the jail. The court cautioned Fink that he could not testify while he was questioning a witness. Thereafter, while examining a witness about the monitoring of his jail calls, Fink again tried to interject his view of the facts. Fink also characterized the assistance Idaho investigators provided to California authorities in a manner that did not reflect the testimony, which prompted the court to admonish Fink about misstating the testimony.

Later, Fink again asked questions that assumed facts that had not been shown. Specifically, Fink assumed that an Idaho investigator provided privileged information to a California prosecutor based on the fact that his jail calls were monitored and certain emails between the investigator and prosecutor had been redacted. The court cautioned Fink that just because documents had been redacted did not prove that the redactions contained his privileged information. However, throughout the hearing, Fink continued to refer to this evidence as containing his privileged information.

During the same hearing, Fink claimed at length that he had not received all his requested discovery from the prosecutor. The prosecutor responded that they had produced all the discovery and that many of Fink's discovery requests sought documents he had already received. The prosecutor added that, notwithstanding, the prosecution had many times offered additional discovery that had already been produced in order to move the case along and to assist Fink. Fink persisted in his

18

claim that he was still missing discovery. The prosecutor reiterated that all requested discovery had been produced to Fink and the information he was seeking did not exist. After hearing the parties' arguments, the court noted Fink was providing the court with "facts that didn't exist." The court stated it had already ruled that Fink had received all of the discovery he was owed and that it would not sign an order requiring the prosecution to turn over discovery that did not exist.

g.    *October 15, 2020 proceedings*

On October 15, 2020, Fink filed a document titled "Material Defense Objections." In this filing, Fink objected to the manner in which the court was conducting the evidentiary hearing. Fink made several allegations, including the court "intentionally placed the wrong burden upon Defendant, in violation of clearly defined law of the Supreme Court"; the court was eliciting "inadmissible testimony for the People, attempting to distort the record, and take advantage of an inexperienced pro-per"; the court "blocked" questions by Fink "under the guise of relevance"; the "court said [it] didn't care what the United States Supreme Court or Court of Appeal said"; and the court said it "would intentionally disregard" precedent. Fink concluded his "Objections" by requesting that Ohannessian not remain on the prosecution team during the evidentiary hearing because "it is a conflict to have an accused felon to [*sic*] gather evidence at these hearings, and it violates due process."

At the evidentiary hearing on October 15, 2020, the court stated: "I want to address initially a motion that [Fink] filed this morning because it continues a pattern that I do not like. And that pattern . . . is that you have impugned my integrity on more than one occasion in your motions. I don't like it. It's

19

inappropriate. If it continues—it's like I would hold an attorney in contempt at some point if they continue to do it after we had a discussion. I will terminate your pro per status." The court went on to explain the rationale for its prior evidentiary rulings: "The burden is initially on you to show that the material [in the jail calls] is privileged. If you do that, the burden then shifts to the People, to not necessarily justify, but show, if they can, that there is no damage, what remedy the court should impose. I haven't looked at my ruling since I made it. And if I misstated myself, certainly I apologize. But don't say that I'm doing it for improper motive, which is what you did again when you filed your motions today or your objections that you listed."

During the afternoon session, the court again discussed some of the allegations that Fink made in his "Objections" and reiterated its admonishment, "I'll emphasize what I did this morning. One more filing impugning my integrity or questioning my honesty, no more pro per."

Later, Fink asked questions in which he stated that Ohannessian was being "criminally investigated."[17] The court corrected Fink, stating Ohannessian was not under criminal investigation, and again reminded Fink not to assume evidence in his questions that lacked a factual basis.

### h.    *October 22, 2020 filing*

On October 22, 2020, Fink filed a document titled "Second Written Material Defense Objections at Evidentiary Hearings." Therein, Fink again complained of the manner in which the court was conducting the evidentiary hearing and claimed the court

---

[17]    This was in reference to the administrative complaint that Fink had filed against Ohannessian.

was attempting to help the prosecution. Under a section titled "Terminating Examination at Critical Point," Fink wrote, "Twice, the court ordered the hearings stopped hours early, with no notice, in the middle of critical portion of the examination." Fink continued: "On October 15, 2020, the court in all of its wisdom, had to have known Ohannessian was in deep trouble, and if it halted the hearing it could allow the People to coach him and give the court time to find a waiver exists on recorded calls that contain no waiver." Fink further wrote: "At [the October 15, 2020] hearing, a [Global Tel Link (GTL)[18]] 'person most knowledgeable' testified the GTL recorded calls do not contain warning prompts. Undiscouraged, the court on its own motion, ordered Defendant's witness to produce evidence if the warning prompts were operational during this period, with the only possible reason so it can speculate away Defendant's Sixth Amendment rights . . . so that it can avoid charging Ohannessian with eight counts of [section] 636."[19]

i. *October 30, 2020 proceedings*

On October 30, 2020, Fink filed a document titled "Defendant's Motion to Disqualify Judge Fidler (CCP-170.1/Common Law)."[20] In his motion, Fink made

---

[18] GTL is the private company that operated the inmate phone system at the San Bernardino County jail.

[19] Section 636 relates to the unlawful eavesdropping or recording of telephone calls.

[20] Previously, on January 31, 2020, Fink filed a motion to disqualify Judge Fidler under Code of Civil Procedure section 170.1. In that motion, Fink made three allegations

21

allegations similar to those he made in his October 15 and October 22 filings.

During the evidentiary hearing on October 30, 2020, the court stated Fink had again impugned the court's integrity with his October 22, 2020 filing. The court indicated its intent to revoke Fink's pro per status. The court added, "It didn't take seven days for you to accuse me of wrongdoing, trying to help the prosecution by terminating the hearing at 3:00 o'clock so that they could go—the prosecutor could go and coach Captain Ohannessian, which, of course, is pure speculation on your part as to what they would do." The court explained it had recessed the last hearing early in order to attend to its responsibilities as the assigned wiretap judge for Los Angeles County.

### j. *November 4, 2020 proceedings*

On November 4, 2020, the court revoked Fink's pro per status[21] because he (1) continually disparaged the court's integrity and accused the court of bias and misconduct; (2) misstated the facts and record, which complicated the hearings and wasted time; and (3) refused to follow orders. The court considered holding Fink in contempt as an alternative, but rejected it because Fink was already in custody. The court appointed Fink's advisory counsel to represent him.

---

against Judge Fidler that he titled: (1) "Rubber Stamp Friend of Police Claim"; (2) "Prejudicial Order in Excess of Jurisdiction"; and (3) "Impermissible Impugning Remarks." Judge Fidler denied Fink's previous motion to disqualify on February 5, 2020.

[21] Prior to revoking Fink's pro per status, the court denied his October 30, 2020 motion to disqualify.

## 2. *Applicable law and standard of review*

The Sixth and Fourteenth Amendments of the federal constitution give criminal defendants the right to self-representation. (*People v. Becerra* (2016) 63 Cal.4th 511, 517-518, citing *Faretta, supra,* 422 U.S. at pp. 807, 819.) However, that right is not without limit. (*Indiana v. Edwards* (2008) 554 U.S. 164, 171 [128 S.Ct. 2379].) At times, the "'government's interest in ensuring the integrity and efficiency of the trial . . . outweighs the defendant's interest in acting as his own lawyer.'" (*People v. Williams* (2013) 58 Cal.4th 197, 253.) For example, a prerequisite of self-representation is a willingness and ability "to abide by rules of procedure and courtroom protocol." (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 173 [104 S.Ct. 944].) To that end, the trial court may terminate self-representation if the defendant is disruptive. (See *Faretta,* at pp. 834-835, fn. 46 [trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct"]; *People v. Carson* (2005) 35 Cal.4th 1, 10 (*Carson*) ["[w]henever 'deliberate dilatory or obstructive behavior' threatens to subvert 'the core concept of a trial' [citation] or to compromise the court's ability to conduct a fair trial [citation], the defendant's *Faretta* rights are subject to forfeiture"]; accord, *People v. Fitzpatrick* (1998) 66 Cal.App.4th 86, 92 [the right of self-representation is not absolute and is not a license to abuse the dignity of the courtroom].)

A court is also justified in revoking a defendant's pro per status when the defendant has "deliberately engage[d] in serious and obstructionist misconduct." (*Faretta, supra,* 422 U.S. at p. 834, fn. 46; see also *People v. Williams, supra,* 58 Cal.4th at p. 253 ["'The right of self-representation is not a license to abuse

23

the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law.' [Citations.]  'Thus, a trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation.'"].)  "This rule is obviously critical to the viable functioning of the courtroom.  A constantly disruptive defendant who represents himself . . . would have the capacity to bring his trial to a standstill." (*People v. Welch* (1999) 20 Cal.4th 701, 734.)

In deciding whether to revoke a defendant's pro per status, the court must consider the nature of the misconduct and its impact on the trial proceedings—whether it "threatens to subvert 'the core concept of a trial'" or "to compromise the court's ability to conduct a fair trial." (*Carson*, *supra*, 35 Cal.4th at p. 10.) Other factors the court should consider include:  "(1) 'the availability and suitability of alternative sanctions,' (2) 'whether the defendant has been warned that particular misconduct will result in termination of in propria persona status,' and (3) 'whether the defendant has "intentionally sought to disrupt and delay his trial."'" (*People v. Ng* (2022) 13 Cal.5th 448, 494-495.)  No one consideration is dispositive; rather, the totality of circumstances should inform the court's exercise of its discretion. (*Carson*, at p. 11.)  "Misconduct that is more removed from the trial proceedings, more subject to rectification or correction, or otherwise less likely to affect the fairness of the trial may not justify complete withdrawal of the defendant's right of self-representation." (*Id.* at p. 10.)

We review the trial court's decision to terminate a defendant's self-representation for an abuse of discretion.

(*Carson*, *supra*, 35 Cal.4th at p. 12.) "The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation," and we will not overturn that decision "'in the absence of a strong showing of clear abuse.'" (*People v. Welch*, *supra*, 20 Cal.4th at p. 735.) We accord great deference to the trial court's "assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial." (*Carson*, at p. 12.) This is because "the extent of a defendant's disruptive behavior may not be fully evident from the cold record," and the trial judge "is in the best position to judge defendant's demeanor." (*Welch*, at p. 735.) As the California Supreme Court has admonished: "We have an obligation to interpret *Faretta* in a reasonable fashion to vindicate the legitimate rights of defendants while at the same time avoiding turning the trial into a charade in which a defendant can continually manipulate the proceedings in the hope of eventually injecting reversible error into the case no matter how the court rules." (*People v. Clark* (1992) 3 Cal.4th 41, 116, abrogated on other grounds in *People v. Edwards* (2013) 57 Cal.4th 658, 704-705.)

      3.    *The trial court did not abuse its discretion in revoking Fink's pro per status because Fink repeatedly disparaged the court, made misrepresentations, and disobeyed court orders*

The trial court acted within the scope of its discretion in revoking Fink's pro per status. Fink continually impugned the integrity of the court, fabricated or misrepresented facts before the court and during witness testimony, and disobeyed court rules, rulings, and orders. Notably, before revoking his pro per status, the trial court warned Fink that it would do so if he

25

continued to disparage the court and ignored the court's instructions. When Fink disregarded that warning, the court revoked his pro per status.

Fink argues the trial court abused its discretion in revoking his pro per status for four reasons. First, Fink contends the trial court revoked his status solely because he sought to recuse and criticized the judge. Fink maintains his conduct did not threaten the fairness of the proceedings. Second, Fink argues the court failed to consider less drastic alternatives. Third, Fink asserts revocation of his right to self-representation was not warranted because his conduct was less disruptive than in other cases. Fourth, he asserts the court did not make an adequate record of the disruption.

Fink's arguments are unconvincing.

First, the court revoked Fink's pro per status in part because of his disparagement of the court. Fink repeatedly impugned the integrity, honesty, and character of the trial judge. For instance, as described, at the July 17, 2020 hearing, Fink asserted without any factual basis that the judge deceived him into agreeing to a 120-day general time waiver. In his October 15, 2020 filing, Fink accused the court of showing bias against him. He argued that the court had improperly shifted the burden on his motion to dismiss to him, and that the court's doing so was motivated by its personal bias against him. The court rejected Fink's characterization of its motives as without any basis in the record, and explained why the ruling had appropriately assigned the burden to him. Seven days later, in his October 22, 2020 filing, Fink again claimed, without any support, the court was biased against him as shown by its ending a hearing early to allow the prosecution time to "coach" a witness. In rejecting that assertion as unfounded, the court observed that

Fink did not cite any evidence to support his claim of bias. The court explained it had scheduled wiretap proceedings in other cases that afternoon that required it to end the hearing in Fink's case early.

Moreover, Fink's conduct went beyond mere criticism of the judge. Fink prolonged hearings because he refused to follow the court's instructions about how to examine witnesses. As described, Fink's questioning of witnesses and presentation of evidence were also punctuated by speculation, misrepresentations of the evidence, and conclusory legal arguments. Several times, the court admonished Fink not to speculate and make misrepresentations. As the court noted, his questions and method of examining witnesses confused the record. His conduct revealed not merely a lack of formal legal training that might be expected of a pro per defendant, but also an unwillingness to comply with the rules of procedure and law, notwithstanding the trial court's repeated directions and warnings.[22]

Second, the trial court considered alternatives to revoking Fink's pro per status. Namely, it expressly considered and rejected holding Fink in contempt. The court also gave Fink clear directions on how to conduct himself, and told Fink that the court understood how "meaningful" self-representation was to him and that being lectured by the court would hurt his case in front of the jury. The court reiterated that if Fink were to continue

---

[22]    For example, earlier in the case, after filing one unsuccessful section 995 motion, Fink attempted to file additional section 995 motions, even after the court specifically cautioned Fink that he could not split his arguments into separate motions.

27

representing himself, he had to do it without violating the rules of the court.

Fink suggests the court should have required his standby counsel to review his written submissions before filing. But that would not have solved the problem because Fink's obstreperous conduct was not limited to his written submissions. He also disrupted proceedings while questioning witnesses in the presence of advisory counsel. Fink's conduct persisted over several hearings, despite repeated admonitions by the court. The court was not required to allow Fink to disrupt pretrial proceedings just to see if he would finally stop at trial. (See *Faretta*, *supra*, 422 U.S. at pp. 834-835, fn. 46 [right of self-representation "is not a license to abuse the dignity of the courtroom" or "a license not to comply with relevant rules of procedural and substantive law"].)

Third, the cases Fink cites do not help him. *Carson*, on which Fink relies, is distinguishable. There, the trial court revoked the defendant's pro per status after he had gained access to discovery he was not entitled to. (*Carson*, *supra*, 35 Cal.4th at pp. 12-13.) The California Supreme Court affirmed the reversal of Carson's conviction and held that out-of-court conduct could be the basis for terminating pro per status. (*Id.* at pp. 9-12, 14.) The court remanded for a hearing on the necessity of terminating Carson's self-representation because the record lacked "a specific assessment of both the nature and the impact of defendant's misconduct to calibrate an appropriate response." (*Id.* at pp. 12-13.) In contrast, the court in this case did not revoke Fink's pro per status based on out-of-court conduct. The record here is fully developed, and there is thus no need for an additional hearing to determine the basis of the court's decision.

28

Equally unavailing is Fink's attempt to minimize the disruptive nature of his conduct by comparing it to more serious conduct in other cases. (See, e.g., *People v. Fitzpatrick, supra*, 66 Cal.App.4th at p. 93 [pro per defendant feigned mental illness for four months, delayed his trial by an additional seven months by escaping from custody, and told the court he would need over a year to get ready for trial].) Those cases establish courts have revoked defendants' pro per status in other cases involving more serious misconduct. But they do not support that Fink's conduct was not sufficiently disruptive here. As the Supreme Court noted in *Carson, supra*, 35 Cal.4th at page 10, "[e]ach case must be evaluated in its own context, on its own facts." (See also *People v. Clark, supra*, 3 Cal.4th at p. 116 ["A finding of *no* error in one situation is not tantamount to the finding of error in another"].)

Finally, contrary to Fink's claim, the court made an adequate record of his continued misconduct. The court warned Fink that he would lose his right to represent himself if he did not conform his conduct. However, Fink refused to take the multiple opportunities the court provided to abide by its rules and orders. (Cf. *People v. Becerra, supra*, 63 Cal.4th at pp. 514-516, 518 [reversing revocation of pro per status when the trial court without warning revoked the defendant's pro per rights].) It was not unreasonable for the court to therefore conclude that Fink's conduct would continue at trial and threaten the fairness of the proceedings. Considering the totality of the circumstances, the court did not abuse its discretion in terminating Fink's self-representation.

B.  *The Trial Court Did Not Abuse Its Discretion When It Denied Fink's Motion To Dismiss for a Violation of His Speedy Trial Rights*

1.  *Factual background*

At multiple hearings between September 2018 and March 2020, Fink waived time and sought continuances of the proceedings.

In March 2020, Governor Gavin Newsom declared a state of emergency in California, and the President declared a national emergency due to the COVID-19 pandemic. The Chief Justice of California issued a statewide emergency order that suspended all jury trials and continued them for 60 days, and extended the deadline under section 1382 for holding a criminal trial within 60 days of the defendant's arraignment by 60 days. (*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1114.) The Chief Justice later extended the section 1382 deadline by another 30 days, thus bringing the total extension of time to hold a criminal trial during the pandemic to 90 days. (*Elias v. Superior Court* (2022) 78 Cal.App.5th 926, 931, 941-942.) The Chief Justice also authorized superior courts to adopt local rules to address the impact of the pandemic. (*Ibid*.) Thereafter, the LASC presiding judge issued a series of emergency orders through October 2021, extending the time for holding criminal trials.[23]

---

[23]  See LASC General Order No. 2020-GEN-019-00 (July 10, 2020); LASC General Order No. 2020-GEN-021-00 (Sept. 10, 2020); LASC General Order No. 2020-GEN-023-00 (Oct. 9, 2020); LASC General Order No. 2020-GEN-026-00 (Dec. 2, 2020); LASC General Order No. 2020-GEN-027-00 (Dec. 31, 2020);

In the interim, in April 2020, Fink filed a notice to withdraw a 120-day time waiver entered on March 13, 2020, the day before the courts closed because of the pandemic. In response to an LASC emergency order, in June 2020, the trial court vacated the pretrial date and continued the matter to July 17, 2020. On July 7, 2020, Fink filed a motion to dismiss, arguing the court was using the pandemic as an excuse to keep him in jail and delay his trial. On July 17, 2020, the court granted Fink's request to withdraw his general time waiver, but denied his motion to dismiss.

Subsequently, Fink refused to waive time at hearings in August and October 2020. In November 2020, after Fink's pro per status was revoked, his counsel, over Fink's objection, asked for and was granted a continuance until January 2021. In February 2021, at a hearing in which Fink sought a modification of his electronic monitoring terms to allow him to visit his family, Fink entered a time waiver, and the court set a status conference in March 2021, and a trial in April 2021.

---

LASC General Order No. 2021-GEN-010-00 (Jan. 28, 2021); LASC General Order No. 2021-GEN-017-00 (Feb. 25, 2021); LASC General Order No. 2021-GEN-018-00 (Mar. 25, 2021); LASC General Order No. 2021-GEN-019-00 (April 22, 2021); LASC General Order No. 2021-GEN-021-00 (May 20, 2021); LASC General Order No. 2021-GEN-022-00 (June 17, 2021); LASC General Order No. 2021-GEN-027-00 (July 19, 2021); LASC Amended General Order No. 2021-GEN-027-02 (July 29, 2021); LASC General Order No. 2021-GEN-028-00 (Aug. 13, 2021); LASC Amended General Order No. 2021-GEN-028-01 (Aug. 26, 2021); LASC General Order No. 2021-GEN-030-00 (Sept. 10, 2021); LASC Amended General Order No. 2021-GEN-030-01 (Sept. 24, 2021); LASC General Order No. 2021-GEN-034-00 (Oct. 7, 2021).

Based on new LASC emergency orders, the trial court continued the case in April, June, July, August, and September 2021.  Fink repeatedly objected that county courthouses had reopened and that some cases had gone to trial.  Fink complained the court appeared to be picking and choosing what cases to bring to trial and was unreasonably delaying his own.  In response to Fink's objections, the court acknowledged that some cases had gone to trial, but also repeatedly explained that Fink's case was delayed because of the pandemic.  The court stated it was challenging to find enough jurors to hold trials and provide safe places for the jurors to deliberate because of ongoing health concerns that required social distancing.

Fink's case was set for a trial readiness conference on October 15, 2021.  The extension of the section 1382 time period in the latest (and final) LASC emergency order was set to expire on October 22, 2021, and the last day for Fink's trial was set for October 25, 2021.  On October 22, 2021, Fink filed another motion to dismiss.  Later that day, at a hearing on the motion, the trial court rejected Fink's claim that the emergency orders were being used as an excuse to delay his trial and found that genuine public health dangers caused by the pandemic prevented the court from holding the trial.  The court denied Fink's motion to dismiss.

On October 25, 2021, the trial court ordered a panel of jurors.  On October 27, 2021, Fink waived his right to a jury trial and proceeded by way of a bench trial.  The bench trial began on October 28, 2021.

On the first day of trial, the court asked defense counsel about his delay in filing a motion in limine, and defense counsel replied that, given the pandemic, he believed another emergency order would be issued.  Later that day, defense counsel informed

the court Fink was "willing to waive time a few days if the Court wants to look at the transcripts to make a ruling regarding in limine motions."

## 2. *Applicable law and standard of review*

A defendant has the right to a speedy trial under both the federal and California Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) Although the speedy trial guarantees are similar, they are independent and operate somewhat differently. (*People v. Martinez* (2000) 22 Cal.4th 750, 765 (*Martinez*).)

The Sixth Amendment to the federal Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." (U.S. Const., 6th Amend.) In *Barker v. Wingo* (1972) 407 U.S. 514 [92 S.Ct. 2182], the United States Supreme Court articulated a balancing test to determine whether a delay in prosecution amounts to a violation of this right. (*Id.* at p. 530.) Under that test, a court must consider four factors: "the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defense caused by the delay." (*Martinez, supra*, 22 Cal.4th at p. 755.)

The California Constitution likewise guarantees a "defendant in a criminal cause . . . the right to a speedy public trial . . . ." (Cal. Const., art. I, § 15.) The Legislature implemented this right by enacting sections 1381 to 1389.8. (*Martinez, supra*, 22 Cal.4th at p. 766.) Section 1382, subdivision (a), provides that, "unless good cause to the contrary is shown," a court "shall order the action to be dismissed" when a defendant in a felony case "is not brought to trial within 60 days

33

of the defendant's arraignment on an indictment or information, . . . or, in case the cause is to be tried again following a mistrial, . . . within 60 days after the mistrial has been declared . . . ." (§ 1382, subd. (a)(2); see §§ 1049.5, 1050, subd. (e).)

"[A] broad variety of unforeseen events may establish good cause under section 1382." (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1198.) For instance, in *In re Application of Venable* (1927) 86 Cal.App. 585, there was an epidemic of infantile paralysis in the town that prohibited calling juries. (*Id.* at p. 587.) The court concluded the quarantine to prevent the spread of the infectious disease was good cause for the delay of trial and there was no unreasonable delay in bringing the case to trial after the epidemic ended. (*Ibid.*) In *People v. Tucker* (2011) 196 Cal.App.4th 1313, the defendant could not appear for trial as he was under quarantine because another inmate had contracted the H1N1 flu virus. (*Id.* at p. 1315.) The court concluded the medical necessity of the defendant's quarantine constituted good cause for the continuance of his trial. (*Id.* at pp. 1317-1318.) And, particularly relevant here, in *Stanley v. Superior Court* (2020) 50 Cal.App.5th 164, the court concluded the COVID-19 pandemic was "of such severity" as to justify a 90-day continuance of the defendant's trial. (*Id.* at p. 166.) The court stated that courthouses were high risk because they involved gatherings of judges, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and juries in excess of what was allowed under executive and health orders. (*Id.* at pp. 169-170 ["[h]ealth quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date"].)

We review the denial of a motion to dismiss for an abuse of discretion. (*People v. Hajjaj*, *supra*, 50 Cal.4th at p. 1197.) That

34

deferential standard requires us to affirm the ruling unless it is outside the boundaries of what the law allows or is so irrational that no reasonable person could agree with it.  (*People v. Johnson* (2022) 12 Cal.5th 544, 605.)

> 3. *The trial court did not abuse its discretion when it denied Fink's motion to dismiss for reasons related to the COVID-19 pandemic*

Fink contends the trial court abused its discretion when it denied his motion to dismiss the case for violating his right to a speedy trial.  We disagree.  In times of emergency, including pandemics, the presiding judge of a superior court may request, and the Chairperson of the Judicial Council may authorize,[24] extensions to the time period under section 1382 for holding a criminal trial.  (Gov. Code, § 68115, subd. (a)(10).)  After the onset of the COVID-19 pandemic, the Chief Justice of California and the LASC presiding judge acted on this authority by issuing emergency orders that progressively extended the deadline under section 1382 through October 22, 2021.  (See *ante*, fn. 23.)

The trial court denied Fink's motion to dismiss after it found the circumstances described in these emergency orders constituted good cause for the delay.  Several times during pretrial hearings, the court noted the pandemic required the court to scale back its services to comply with statewide orders designed to protect the public.  Even though LASC courthouses reopened in summer 2021, the courts gave priority for in-person hearings to proceedings where an individual could be entitled to

---

[24]    The Chief Justice serves as the Chairperson of the Judicial Council.  (Cal. Const., art. VI, § 6, subd. (a); Cal. Rules of Court, rule 10.2(b)(1)(A).)

35

immediate release from custody after a short hearing, such as arraignments and sentencing hearings that would result in a defendant's release and bail motions challenging pretrial confinement. Moreover, even after trials could resume, the courts struggled to seat juries and find safe spaces to conduct proceedings. The court described this difficulty to the parties in August 2021, explaining "the biggest problem we have with these continuances is picking a jury and then having a place for the jury to deliberate because we've run out of courtrooms." The court noted it was forced to switch to a larger courtroom for a different trial because it "couldn't legally" conduct the trial in the normal courtroom because of social distancing requirements.

Notably, the continuances here were also not attributable to the fault or neglect of the state, or the conduct of the prosecution. (See *People v. Johnson* (1980) 26 Cal.3d 557, 572 [considering whether court congestion excused compliance with the speedy trial statute time limits, and acknowledging the critical inquiry is whether the backlog is attributable to chronic conditions (which do not demonstrate good cause to delay a trial) as opposed to exceptional circumstances (which do)]; accord, *People v. Engram* (2010) 50 Cal.4th 1131, 1163.) Operating courthouses at reduced capacity was a reasonable measure to protect public health during the COVID-19 pandemic, a unique event beyond the court's control. (See also *Hernandez-Valenzuela v. Superior Court*, *supra*, 75 Cal.App.5th at p. 1130 [backlog of jury trials caused by earlier pandemic-related court closure constituted good cause for continuance even where the defendant showed there were courtrooms available for trials].)

Fink's citations to *Bullock v. Superior Court* (2020) 51 Cal.App.5th 134, 141, 142 and *Lacayo v. Superior Court* (2020) 56 Cal.App.5th 396, 399-400 do not change our view. Those cases

36

considered the application of the statewide COVID-19 emergency orders extending certain court deadlines to the mandatory statutory deadlines for preliminary hearings under section 859b. (*Lacayo*, at pp. 399-400; *Bullock*, at p. 141.) For example, in *Bullock*, the court held that the time to hold a preliminary hearing during the pandemic may be extended where a "particularized showing" of good cause is made. (*Bullock*, at p. 140.) But the *Bullock* court recognized that "preliminary hearings and trials involve different considerations" and, therefore, "circumstances in a pandemic that constitute good cause to continue a trial may not constitute good cause to continue a preliminary hearing for a defendant in custody." (*Id.* at p. 156.) Fink's case does not involve preliminary hearing deadlines. Cases that did, like *Bullock* and *Lacayo*, are therefore inapposite.

In sum, the court-imposed continuances show they were reasonably based on the COVID-19 emergency, subsequent emergency orders of the Chief Justice and the Presiding Judge of the LASC, and the trial court's findings of good cause based on the inability to safely conduct a trial. Because these are valid reasons for the delay in this case, we conclude Fink's speedy trial claims lack merit and the trial court did not abuse its discretion when it denied Fink's motion to dismiss. (See *Elias v. Superior Court, supra*, 78 Cal.App.5th at pp. 941-943 [no violation of state or federal speedy trial rights where delay in holding trial caused by COVID-19 pandemic and no findings of prosecutorial negligence in causing delay].)

C.   *The Trial Court Did Not Abuse Its Discretion in Ruling There Were No Relevant Records To Disclose in Response to Fink's* Pitchess *Motion*

1.   *Factual background*

In December 2018, Fink filed a motion under *Pitchess, supra*, 11 Cal.3d 531, requesting discovery of Ohannessian's personnel file.  Fink requested records related to illegal, unconstitutional, unethical, unprofessional, or improper searches and seizures; dishonesty, falsifying or altering reports, falsifying or altering evidence, or potentially impeaching misconduct; evidence of moral turpitude or morally lax character; and evidence of coercive conduct.  Although it initially denied the motion, after oral argument, the trial court reversed itself and granted the motion.

On September 10, 2020, San Bernardino County Counsel and the SBSD custodian of records appeared in court with Ohannessian's personnel file.  The trial court conducted an in-camera hearing, and the custodian of records testified and provided records for the court's review.  The trial court described the documents on the record.  Based on the testimony and materials it reviewed, the court ruled there were no discoverable records.  It ordered the in-camera hearing transcript sealed.

2.   *Applicable law and standard of review*

Under *Pitchess*, a defendant may bring a motion for disclosure of certain information in the personnel files of police officers by showing good cause for discovery and how it would support a defense.  (Evid. Code, §§ 1043-1045; Pen. Code, §§ 832.7, 832.8; *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018-1019.)  If the court finds good cause, the court must hold an

in-camera hearing, during which the custodian of records brings "all documents 'potentially relevant' to the defendant's motion." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226.) "Subject to statutory exceptions and limitations . . . , the trial court should then disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.'" (*Ibid*.) The court must make a record that will permit future appellate review. (*Id.* at pp. 1229-1230.) The court may preserve the record by copying the documents and placing them in a confidential file, preparing a sealed list of the documents it reviewed, or stating on the record what documents it examined. (*Id.* at p. 1229.) "A trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.)

> 3. *An independent review of the* Pitchess *record demonstrates the trial court did not abuse its discretion*

Fink requests we independently review the record of the trial court's in-camera *Pitchess* proceedings. Specifically, he asks this court to determine (1) whether the trial court prepared a sufficient record, and (2) whether the trial court abused its discretion in finding there was nothing relevant to disclose. Fink also urges us to consider the Legislature's recent amendments to section 832.7 that provide broader public access to police personnel files based on a clarification of the term "dishonesty." (§ 832.7, subd. (b)(1)(C), as amended by Stats. 2018, ch. 988, § 2, eff. Jan. 1, 2019 (Sen. Bill No. 1421); Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1421 (2017-2018 Reg. Sess.) Aug. 31, 2018, p. 2 [referring, in the fifth clause of the

39

summary of Assembly Amendments, to "the dishonesty of an officer that would trigger release of records is related directly to the reporting, investigation, prosecution, including sustained findings of perjury, false statements, filing false reports, destruction, falsifying, or concealing evidence"].) The People do not oppose Fink's requests.

We have reviewed the confidential reporter's transcript of the September 10, 2020 in-camera hearing. The custodian of records represented he did a thorough and complete search of all places where records might exist, and the trial court described what it reviewed on the record. Having independently reviewed the sealed transcript of the *Pitchess* proceeding, we conclude the trial court followed proper *Pitchess* procedures and did not erroneously withhold any information. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 646-648.) Even considering the recent amendments to the *Pitchess* review process, the trial court did not abuse its discretion in finding there were no complaints, investigations, or anything else that required disclosure.

> D. *Substantial Evidence Supports Fink's Convictions of Theft by False Pretenses*

Fink argues there was insufficient evidence to support 16 of his convictions for theft by false pretenses under section 532. Specifically, he contends this court must reverse nine convictions (counts 2, 9, 22, 30, 42, 43, 46, 47, and 56) because the evidence at trial failed to establish the element that he acquired money from the victims. In addition, he complains that seven convictions (counts 20, 21, 41, 45, 47, 50, and 55) cannot stand because the prosecution failed to present evidence of a false writing as section 532 requires. We address these challenges in turn.

40

1. *Standard of review*

In reviewing a claim for sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Flinner* (2020) 10 Cal.5th 686, 748.) We review the entire record to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, not whether the evidence proves guilt beyond a reasonable doubt. (*Ibid*.)

This standard of review does not permit us to reweigh the evidence or reevaluate the credibility of witnesses. (See *People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) Instead, we presume the existence of every fact the jury reasonably could have deduced from the evidence in support of the judgment. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We assume the jury rejected evidence that does not support the judgment. (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.) We will not reverse simply because the circumstances of a case might reasonably support a finding contrary to the jury's. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; accord, *People v. Houston* (2012) 54 Cal.4th 1186, 1215.) Consequently, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Zamudio*, at p. 357.)

2. *Substantial evidence supports Fink's conviction on counts 2, 9, 22, 30, 42, 43, 46, 47, and 56*

a. *Factual background*

The evidence relevant to the nine convictions where Fink asserts he never received the victim's funds is as follows:

(1) *Arencibia v. Ralphs* (count 2): The Los Angeles County Sheriff's Department (LASD), acting on a writ of execution submitted by USJRU, executed a till tap at Ralphs and levied $4,156.07 in cash. However, Ralphs counsel testified that, upon receiving notice of the till tap, he contacted the LASD and put a hold on the money. Ultimately, USJRU did not receive money from this writ.

(2) *Atkins v. Swift Transportation* (count 9): The Kings County Sheriff's Department (KCSD), acting on a writ of execution, executed a bank levy on behalf of USJRU at Wells Fargo Bank and Citibank, and received checks for $8,740.29 and $6,740.29, respectively. An attorney for the judgment debtor, Swift Transportation, then contacted the KCSD. Fink (acting as David Anderson) told the KCSD that the writ should not have been issued because the judgment was satisfied in 2004. Swift Transportation received all the money back.

(3) *Felder v. Canon USA* (count 22): The parties stipulated that John Fernandez of the LASD would testify that, even though the LASD received a letter from David Anderson instructing it to serve a bank levy on Bank of America under a writ of execution, the LASD did not seize any money on the writ. However, evidence from USJRU's accounts showed Canon USA sent a check for $10,182.19 directly to USJRU, and David Anderson endorsed the check.

(4) *Barnes v. JCPenney* (count 30): The San Joaquin County Sheriff's Office executed a writ of execution and collected $2,219.24 from JCPenney based on an alleged assignment of a judgment to USJRU. However, JCPenney had already paid the judgment to the plaintiff. A loss prevention officer of JCPenney testified that, when she received notice of the levy, she intervened. The funds were returned to JCPenney.

(5) *Gore v. Toyota* (count 42): The LASD served a bank levy in reliance on a writ of execution from USJRU. The LASD received a check for $2,544.90 from Citibank to satisfy the levy. However, Toyota had already paid the judgment to the plaintiff, and the LASD learned that the judgment had not been assigned to USJRU. Los Angeles County issued a check to Citibank to refund the levied money. No money was sent to USJRU.

(6) *Hickel v. United Valet* (count 43): The Amador County Sheriff's Office received a letter from USJRU about a writ of execution for a levy on Wells Fargo Bank. The sheriff's office executed the writ, received a check from Wells Fargo, and deposited the check into a civil trust fund until it could be transferred to the person who sent the writ. However, the sheriff's office received information that caused it to hold the check. Ultimately, the sheriff's office did not send the money to USJRU. The money was returned to the civil trust fund.

(7) *Diberardino v. GMC* (count 46): The LASD, acting on the writ it had received from USJRU, executed a levy and received $10,293.51 from Citibank. Subsequently, the LASD received a letter from Fink asking it to return the funds to the judgment debtor. The parties stipulated that no funds were sent to Fink.

(8) *Lough v. Petco* (count 47): The Glenn County Sheriff's Office received a letter of instruction from USJRU to

43

levy U.S. Bank for the small claims case of *Elizabeth Lough v. Petco*. The sheriff's office executed the bank levy. After the county got the money, it discovered the claim had already been paid. The county did not transfer the funds to Fink.

(9) *Lozier & Beesley v. Sears* (count 56): The Nevada County Sheriff's Office received writs of execution and letters of instruction from USJRU. The sheriff's office served a bank levy and collected $4,884.12 from Sears. The sheriff's office held the seized funds in its trust account and ultimately returned the money to Sears.

During closing argument, the prosecutor acknowledged that, for these nine counts of theft by false pretenses, Fink never received the funds that were collected on his behalf from the victims. Without that showing, the prosecutor conceded the court should treat the charge as the lesser included offense of attempted theft by false pretenses.[25]

When it announced the verdicts, the trial court stated it disagreed with the People's argument that these counts should be considered only attempted offenses. Instead, the court pointed to *People v. Jones* (1950) 36 Cal.2d 373 (*Jones*) and *People v. Cheeley* (1951) 106 Cal.App.2d 748 (*Cheeley*), explaining they declared that one is guilty of theft by false pretenses whenever money is delivered to another for the thief's benefit. Such was the case here, the court continued, noting the evidence showed money was delivered to the county on Fink's instructions for each of these counts.

---

[25] The prosecutor did not concede that the charge in *Felder* (count 22) should be considered the lesser included offense of attempted theft by false pretenses.

44

b.      *Substantial evidence supports Fink's convictions where he personally did not receive the victim's funds*

Fink urges us to reverse his convictions on the nine counts under section 532 because he never received funds from the victims, which he claims the crime requires.  The People disagree.  They assert *Jones* and *Cheeley* state there is sufficient evidence of theft by false pretenses when the true owner's property is delivered to the defendant or *another for the defendant's benefit*.  The People have the better argument.[26]

---

[26]     Fink argues the People should be judicially estopped from asserting sufficient evidence supported the convictions because the prosecutor conceded the evidence only proved attempted theft by false pretenses.  We disagree.  The judicial estoppel doctrine applies when "'""(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.'""'"  (*People v. Castillo* (2010) 49 Cal.4th 145, 155.)  The elements of judicial estoppel are not met here because the prosecution was not "successful in asserting the first position."  (*Ibid.*)  The trial court rejected the People's argument that the evidence only established attempted theft by false pretenses and determined instead that the charged crimes were in fact completed.

1) *Fink did not need to personally receive the victim's funds*

Case law supports the trial court's determination that Fink did not need to personally receive a victim's money in order to be convicted of theft by false pretenses.

In *Jones*, the defendant induced the victims to pay money to a partnership through fraudulent representations and then used that money to pay the partnership's debts. (*Jones*, *supra*, 36 Cal.2d at pp. 381-382.) The California Supreme Court held theft by false pretenses did not require the defendant to obtain the money for himself, and that it was sufficient if the money was "'delivered to another, either for the benefit of that other or for [defendant's] benefit.'" (*Ibid*.)

A year later, the court in *Cheeley*, *supra*, 106 Cal.App.2d 748, reached the same conclusion: "Appellant contends that she cannot be guilty of theft by reason of the fact that she did not herself gain possession of the money. The authority cited in support of such contention is not the law. One is guilty of theft, if as a result of his false pretenses, money or property of value is delivered to another person for the benefit of anyone other than the rightful owner." (*Id.* at pp. 752-753; see also *People v. Ashley* (1954) 42 Cal.2d 246, 259 [money acquired was used for expenses of corporation]; *People v. Schmidt* (1956) 147 Cal.App.2d 222, 228 [check was made payable to corporation; it was not necessary to show that defendant actually took full amount in question, or that he benefited personally].)

After *Jones* and *Cheeley* were decided, section 484 consolidated various theft offenses, defining them as the unlawful taking of another's property. (§ 484; *People v. Creath* (1995) 31 Cal.App.4th 312, 318.) The crime of theft includes larceny,

46

embezzlement, larceny by trick, and theft by false pretenses, among other offenses.  (*Creath*, at p. 318; CALJIC No. 14.00 (7th ed. 2005).)

Notwithstanding the consolidation of theft crimes under section 484, neither *Jones* nor *Cheeley* has been overruled, and they continue to reflect the law.  (See *People v. Traster* (2003) 111 Cal.App.4th 1377, 1387 [theft by false pretenses does not require that the defendant take property, just that the victim relinquish possession and title of the property]; CALJIC No. 14.10 (7th ed. 2005) [jury instructions for theft by false pretenses is "accomplished in that the alleged victim parted" with property "intending to transfer ownership thereof"]; Use Notes to CALCRIM No. 1804 [referencing *Cheeley* in the instructions for theft by false pretenses]; 3 Wharton's Criminal Law (15th ed. 2023) § 4:29.)

Under *Jones* and *Cheeley*, Fink could be convicted of theft by false pretenses even if he did not personally receive the victim's money.  As in those cases, the undisputed evidence of the nine challenged counts demonstrates the victims' funds were transferred based on Fink's false inducements.  In each case, the funds were taken from the victim—either through a bank levy or a till tap—solely for Fink's benefit.  After the funds were taken, either Fink received the money (as in count 22, where the victim sent the funds directly to USJRU), or a county sheriff or other county department received the money on Fink's behalf (as in the other eight counts).

2) *Fink's cited cases are distinguishable*

Fink maintains that *Jones* and *Cheeley* no longer reflect the law of theft by false pretenses.  But the authority Fink cites is distinguishable and does not conflict with *Jones* and *Cheeley*.

For example, Fink cites *People v. Wooten* (1996) 44 Cal.App.4th 1834 to support his argument that the law requires the victim to transfer the funds directly to the defendant.  (*Id.* at p. 1842.)  However, *Wooten* addressed the victim "reliance" requirement of the offense, not the element at issue here.  (See *id.* at pp. 1842-1843 [describing the elements of theft by false pretenses as including proof that "the owner transferred the property to the defendant in reliance on the representation"]; see also *Styne v. Stevens* (2001) 26 Cal.4th 42, 57 ["An opinion is not authority for a point not raised, considered, or resolved therein."].)  Further, for the elements of the section 532 offense, *Wooten* cites to cases that are consistent with *Jones* and *Cheeley*.  (*Wooten*, at p. 1842, citing *Perry v. Superior Court* (1962) 57 Cal.2d 276, 282-283 [relying on *Jones* and other cases to describe the relevant element as requiring proof "that the owner was in fact defrauded in that he parted with his property in reliance upon the representation"]; *People v. Whight* (1995) 36 Cal.App.4th 1143, 1151 [addressing the victim reliance element and defining the relevant element here as satisfied when one "'defrauds any other person of money, labor, or property, whether real or personal, . . .'"].)

The other cases Fink cites are equally distinguishable. Some involved crimes other than theft by false pretenses.  (See *Bell v. Feibush* (2013) 212 Cal.App.4th 1041, 1049 [concerning receipt of stolen property, not theft by false pretenses]; *People v.*

48

*Traster, supra,* 111 Cal.App.4th at pp. 1386-1389 [concerning grand theft by trick, not theft by false pretenses]; *People v. Shannon* (1998) 66 Cal.App.4th 649, 654 [concerning theft in the context of shoplifting, not a false pretenses case]; see also *People v. Kaufman* (2017) 17 Cal.App.5th 370, 380 [concluding the evidence supporting a grand theft charge would also support a conviction under section 532].)  In others, the victim did not lose possession of the funds because the victim discovered the deceit and prevented the transfer of property to the defendant or an intermediary.  (See *People v. Layman* (1968) 259 Cal.App.2d 404, 407-408 [concluding the crime was an attempt because the victim stopped the transaction before paying the defendant].)

Accordingly, the trial court did not err in determining Fink committed theft by false pretenses.  Because the evidence at trial proved the victims' funds were transferred from the victims' possession to either Fink or a third party who held those funds for Fink's benefit, we reject his challenges to the sufficiency of the evidence supporting counts 2, 9, 22, 30, 42, 43, 46, 47, and 56.

       3.    *Substantial evidence supports Fink's conviction on counts 20, 21, 41, 45, 47, 50, and 55*

       a.    *Factual background*

The evidence relevant to the seven convictions of theft by false pretenses where Fink claims there was no proof of a false writing is as follows:

(1)    *George v. Toys* [R] *Us* (count 20):  The parties stipulated that the LASD received a letter from "David Anderson of USJRU" along with a writ of execution requesting bank levies on U.S. Bank and Citibank.  The writ was for the small claims case "George versus Toys [R] Us out of Contra Costa County

49

Superior Court." The LASD received $4,948.60 from U.S. Bank after executing a levy in reliance on the writ. Los Angeles County later sent a check to USJRU for $4,936.60.

A financial forensic expert identified a bank statement and check copy that matched the county check made to USJRU, as well as a Los Angeles County warrant for $4,936.60, regarding the case of *George v. Toys [R] Us*, with a deposit ticket and account number for David Anderson and a copy of the check made out to USJRU and endorsed by David Anderson. A computer forensic examiner also found files regarding the case of *George v. Toys [R] Us* in Fink's electronic records.

(2) *Alsartawi v. Best Buy* (count 21): The parties stipulated that the Merced County Sheriff's Office received a letter from "David Anderson of USJRU, Inc.," instructing it to serve a bank levy on Citibank based on a writ of execution for the small claims case "Alsartawi versus Best Buy out of Stanislaus County Superior Court, SC359045." The sheriff's office received $3,992.93 from Citibank after executing a levy in reliance on the writ. Merced County later sent a check to USJRU for $3,910.93.

(3) *Sanchez v. El Pollo Loco* (count 41): The parties stipulated that the Kern County Sheriff's Office received a letter from "David Anderson at USJRU," instructing it to serve a bank levy on Wells Fargo based on a writ of execution for the small claims case "Sanchez versus El Pollo Loco out of Los Angeles County Superior Court, 05M 09208." The sheriff's office received $9,676.87 from Wells Fargo after executing a levy in reliance on the writ. Kern County later issued a check to USJRU for $9,664.87.

A financial forensic expert identified a bank statement and check copy that matched the county check made payable to USJRU, as well as a warrant from Kern County for $9,664.87.

The payment was for the civil writ of *Sanchez v. El Pollo Loco*, was endorsed by David Anderson, and was deposited in October 2014 into USJRU's account. A computer forensic examiner found files relating to the case of *Leonardo Sanchez v. El Pollo Loco* in Fink's electronic records.

(4) *Hickel v. United Valet Parking* (count 45): The prosecution presented court records from the small claims case of *Hickel v. United Valet Parking*, including an assignment of judgment to USJRU. Evidence also showed that the Amador County Sheriff's Office received a letter from USJRU requesting service of a levy on Wells Fargo pursuant to a writ of execution. The sheriff's office executed the writ and received a check from Wells Fargo, which it deposited into the Amador County civil trust fund checking account until the funds could be transferred to USJRU. The day the sheriff's office received the county warrant, it also received information from the San Joaquin County Sheriff's Office that stopped the office from sending the check to USJRU. Ultimately, the money from Wells Fargo was returned to the civil trust fund, and another warrant was issued to United Valet Parking.

The Amador County Sheriff's Office clerk identified some of the documents, including the writ of execution, the letter of instruction, the information from the San Joaquin County Sheriff's Office, and the original warrant from the county auditor with "void" written on it by the clerk. A computer forensic expert identified documents found on Fink's computer regarding the case of *Hickel v. United Valet Parking*.

(5) *Lough v. Petco* (count 47): At trial, the prosecution presented court records from the case of *Elizabeth Lough v. Petco Animal Supplies*, including an assignment of judgment to USJRU. Evidence also showed that, following the filing of the

51

assignment, the Glenn County Sheriff's Office received a letter of instruction from USJRU to levy U.S. Bank for the small claims case of *Lough v. Petco*. The sheriff's office received and deposited a check from U.S. Bank. After that, the California Attorney General's Office contacted the sheriff's office and requested documents regarding the levy.

At trial, the clerk who processed the check from U.S. Bank identified the letter of instruction from David Anderson, the revocation included with the letter of instruction, the second page of the writ, the check for $4,425.15 from the finance department, the sheriff's office's claim to the finance department requesting issuance of the check, and a subsequent email from Petco that indicated Lough had already been paid. A computer forensic expert who examined Fink's computer found documents pertaining to the case of *Elizabeth Lough v. Petco*.

(6)    *Lema v. Unified Parking* (count 50): The parties stipulated that the LASD received a letter from David Anderson of USJRU instructing the LASD to serve a bank levy on East West Bank based on a writ of execution for the small claims case of *Paula Lema v. Unified Parking*. In reliance on the writ, the LASD served the levy on East West Bank. The LASD received $2,539.72 from East West Bank. Los Angeles County later issued a check to USJRU for $2,527.72.

A financial forensic expert identified a bank statement and check copy that matched the LASD check made payable to USJRU, as well as a Los Angeles County warrant for $2,527.72 related to the case of *Paula Lema v. Unified Parking*. The expert also identified a bank deposit ticket for the account of David Anderson and a copy of the deposited check paid to USJRU with an endorsement on the back. Other evidence showed files on

52

Fink's computer pertaining to the case of *Paula Lema v. Unified Parking*.

(7) *Reid v. California Parking Systems* (count 55): At trial, the parties stipulated that the LASD received a letter from David Anderson of USJRU instructing the LASD to serve a levy on California Parking Systems based on a writ of execution for the case of *Jonathan Reid v. California Parking Systems*. The LASD went to the location listed in the letter to serve the levy. However, the LASD could not find the company. The same month, the LASD received a letter from David Anderson of USJRU with instructions to serve a bank levy at Chase Bank based on a writ of execution for the case of *Jonathan Reid v. California Parking Systems*. The LASD executed the levy and received $2,343.61 in reliance on the writ. Los Angeles County later sent a check to USJRU for $2,331.61. In addition, files on Fink's computer contained information about the victim.

> b. *Substantial evidence supported the false writing element of the crime*

Fink claims that evidence supporting counts 20, 21, 41, 45, 47, 50, and 55 is insufficient because the prosecution failed to establish that the documents used to carry out the crimes were false writings under section 532. A conviction of theft by false pretenses requires (1) corroboration by either a false token or false writing, (2) a writing subscribed by or in the handwriting of the defendant, or (3) testimony of two witnesses or testimony of one witness and corroborating circumstances. (See § 532, subd. (b); accord, *People v. Henning* (2009) 173 Cal.App.4th 632, 642.)

Fink argues that as to counts 20, 21, 41, 45, 47, 50, and 55, the prosecution did not introduce evidence of a false writing

53

beyond hearsay evidence.  Fink asserts that in the other counts, the People showed there was a false writing with testimony that the notarization was fake, or testimony that the signature on the assignment was not authentic.  As to the challenged counts, however, Fink claims the prosecution's "evidence failed to prove that these particular transactions were anything but a legitimate debt-collection."

Here, there was substantial evidence of a false writing as to each of the challenged counts.  For each count, the prosecution presented circumstantial evidence showing the writings Fink submitted to superior courts and sheriff's offices were false because he used a fake identity and a shell company.  Moreover, proof of the false writings was established by witnesses, including notaries and other claimants, who testified about Fink's other section 532 counts, which involved the same ongoing criminal scheme.  This evidence supplied sufficient corroboration to sustain Fink's conviction.  (See *People v. Gentry* (1991) 234 Cal.App.3d 131, 139 ["The multiple witnesses required under Penal Code section 532, subdivision (b), need not testify to the same instance of pretense.  When more than one witness testifies to a defendant's false pretenses, even though made on separate occasions, the multiple witness requirement is met as long as the same type of scheme is involved, and the same manner is employed."]; *People v. Miller* (2000) 81 Cal.App.4th 1427, 1442 [corroborative evidence may be found in the defendant's declarations to other persons].)  Fink employed a broad criminal scheme to steal funds from dozens of victims.  There was no evidence that Fink ever conducted a legitimate judgment recovery or debt collection business.  Substantial evidence supported counts 20, 21, 41, 45, 47, 50, and 55.

### E. *We Remand for Resentencing on Counts 54, 59, 62, and 63 To Allow the Trial Court To Exercise Sentencing Discretion Under Amended Section 654*

#### 1. *Factual background*

Counts 54 (§ 532, subd. (a)) and 59 (§ 115, subd. (a)) charged Fink with crimes in connection with the small claims case of *Anderson v. Sears*. The trial court sentenced Fink for his conviction on count 54 to a middle term of two years, which was stayed under section 654. For his conviction on count 59, the court sentenced Fink to a consecutive term of 16 months, which consisted of one-third the middle term of 24 months (eight months), doubled because of a prior strike.

Counts 62 (§ 115, subd. (a)) and 63 (§§ 664/487, subd. (a)) charged Fink with crimes in connection with the small claims case of *Carter v. Staples*. For his conviction on count 62, the court sentenced Fink to a consecutive term of eight months, which consisted of one-third the middle term of 24 months. For his conviction on count 63, the court sentenced Fink to a middle term of one year, which was stayed under section 654.

#### 2. *Applicable law*

Recent amendments to Penal Code section 654, which took effect after Fink was sentenced, give trial courts the discretion to select any available term of imprisonment, regardless of the length. (§ 654, as amended by Stats. 2021, ch. 441, § 1.) "Previously, where . . . section 654 applied, the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term[s]. (§ 654, former subd. (a) [Stats. 1997, ch. 410, § 1].) As amended by Assembly Bill [No.] 518, section 654 now provides

the trial court with discretion to impose and execute the sentence of [any] term, which could result in the trial court imposing and executing [a] shorter sentence rather than the longe[st] sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379; see *People v. Kramer* (2002) 29 Cal.4th 720, 723-725 [former subdivision (a) of section 654 includes enhancements when determining which offenses provide for a longer potential term of imprisonment].)

Before the amendments, to determine which term was the longer sentence for former section 654, the proper comparison was the longest *potential* term of imprisonment given the charges, not the term the court *actually* imposed. (See § 654, former subd. (a) ["shall be punished under the provision that provides for the longest potential term of imprisonment"]; see also *People v. Kramer*, *supra*, 29 Cal.4th at pp. 722-723.) That determination also includes sentencing enhancements. (*Kramer*, at p. 723.)

### 3. *The amendments to section 654 require resentencing*

The parties agree, and we concur, the amendments to section 654 apply retroactively to Fink's sentences. (See *People v. Mani*, *supra*, 74 Cal.App.5th at p. 379.) The only question is whether remand is warranted. The People assert remand is not needed on counts 54 and 59 because the court stayed the sentence on the longer term of two years for count 54 and imposed a shorter consecutive term of 16 months for count 59. Likewise, the People contend remand is unnecessary regarding counts 62 and 63 because the court imposed the shorter sentence on count 62 and stayed the longer sentence on count 63.

56

Based on the sentences imposed, the trial court complied with former section 654. The sentence range under section 532, subdivision (a) (count 54), and under section 115, subdivision (a) (count 59), is the same—16 months, two years, and three years. However, the strike finding doubles the potential sentence on count 59, and therefore the potential sentence on count 59 is longer than the potential sentence on count 54. Thus, it appears the trial court followed former section 654 by imposing the longer potential sentence and staying the shorter sentence. We reach the same conclusion with respect to count 62 (§ 115, subd. (a)) and count 63 (§§ 664/487, subd. (a)). The sentencing range for section 115, subdivision (a), is 16 months, two years, and three years, and the sentencing range for count 63 was eight months, 12 months, and 18 months. Comparing the potential sentence on each count, the court imposed the sentence with the longer potential sentence (count 62) and stayed the sentence with the shorter potential sentence (count 63).

We presume the court was not exercising discretion it had not yet been granted under amended section 654. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 ["Absent evidence to the contrary, we presume that the trial court knew and applied the governing law"].) Trying to determine what a trial court would have done had it been aware of its discretion is speculative here. Rather, we remand for resentencing because the record does not clearly indicate the trial court would have imposed the same sentence had it had that discretion at its disposal. (*Gutierrez*, at p. 1391.)

57

F.   *The Restitution Order on Counts 15 and 19 Is Not Supported by Substantial Evidence*

1.   *Factual background*

The court ordered victim restitution in the amount of $101,881.73.  Fink challenges that order with regard to two counts (counts 15 and 19).  The evidence at trial showed the following for those counts:

(1)   *Glickstein v. PacBell* (count 15):  The parties stipulated that the KCSD executed a levy on behalf of Fink on Chase Bank for $8,243.73 and issued a check to USJRU in the same amount.  An attorney for AT&T (formerly PacBell) discovered the levy was improper and demanded reimbursement from Fink.  Fink sent a full refund to PacBell.  Although PacBell suffered no economic loss, the trial court ordered Fink to pay PacBell $8,243.73 in restitution.

(2)   *Artolachipe v. Unified Valet Parking* (count 19):  The trial court ordered Fink to pay Unified Valet Parking $14,916.71 in restitution on count 19.  This included $10,573.04 for two levies LASD executed on East West Bank.  The undisputed evidence showed the first levy for $5,358.68 was returned to East West Bank.[27]

2.   *Applicable law and standard of review*

Restitution is based on the amount of loss the victim claims and should fully reimburse the victim for every economic loss the defendant's criminal conduct caused.  (See § 1202.4, subds. (a)(1)

---

[27]   Based on the second levy, the LASD sent a check to USJRU for $5,202.36, which was not returned.

["[i]t is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime"] & (f); see also *People v. Woods* (2008) 161 Cal.App.4th 1045, 1049 ["section 1202.4 . . . limit[s] restitution awards to those losses arising out of the criminal activity that formed the basis of the conviction"].)  In general, a defendant forfeits claims of error by the trial court, including in calculating restitution, when the defendant fails to object in the trial court.  (See *People v. Anderson* (2010) 50 Cal.4th 19, 26 & fn. 6; *People v. Pinon* (2016) 6 Cal.App.5th 956, 968; *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218.)  However, a victim restitution order is not authorized if no loss was suffered. (See *People v. Slattery* (2008) 167 Cal.App.4th 1091, 1094-1095 [striking trial court's victim restitution order requiring the defendant to pay restitution to an entity that suffered no loss].) Further, an order requiring the defendant to pay restitution to someone who, based on undisputed evidence, is not entitled to it is an unauthorized sentence.  (*People v. Lee* (2018) 24 Cal.App.5th 50, 54, fn. 2; *Woods*, at p. 1050.)  An unauthorized sentence "'constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal.'"  (*Anderson*, at p. 26; see also *People v. Rivera* (2019) 7 Cal.5th 306, 348-349 [holding an unauthorized sentence is one that ""'could not lawfully be imposed under any circumstance in the particular case'"" and "is reviewable on appeal regardless of whether it was objected to at trial"].)  We review the trial court's restitution order for an abuse of discretion.  (*People v. Grandpierre* (2021) 66 Cal.App.5th 111, 115.)

3.    *The trial court erred in ordering Fink to pay restitution for amounts already returned to the victims*

Fink argues the trial court should not have ordered restitution of $13,602.41 ($8,243.73 plus $5,358.68) on counts 15 and 19 because the undisputed evidence showed those funds were returned to the victims.  The People contend that Fink forfeited his argument because he failed to object to the restitution order in the trial court.

We agree with Fink.  The victims of the crimes in counts 15 and 19 were not entitled to restitution because the undisputed evidence showed the funds were returned to them.  The order requiring Fink to pay the restitution was therefore unauthorized, and Fink did not forfeit his argument by failing to object.  (See *People v. Williams* (2017) 7 Cal.App.5th 644, 696 [stipulating to restitution did not forfeit "the purely legal issue whether the court imposed the restitution order in excess of its statutory authority"]; *People v. Percelle* (2005) 126 Cal.App.4th 164, 179 [unauthorized restitution order was "in excess of [the court's] statutory authority," and the defendant did not forfeit the issue by failing to object].)

The cases on which the People rely to argue that the forfeiture exception should not apply are distinguishable.  In both *People v. Garcia, supra,* 185 Cal.App.4th at p. 1218 and *People v. Brasure* (2008) 42 Cal.4th 1037, 1075, the parties disputed the facts that supported the restitution orders.  The courts therefore found that by failing to object, the defendants "forfeited any claim that the order was merely unwarranted by the evidence, as distinct from being unauthorized by statute." (*Basure*, at p. 1075; see also *Garcia*, at p. 1218 [reasoning the "appropriate amount of restitution is precisely the sort of factual determination that can

60

and should be brought to the trial court's attention if the defendant believes the award is excessive"].)

Here, the parties do not dispute the facts underlying the restitution amounts for counts 15 and 19. Those undisputed facts show the victims did not suffer the economic losses identified in the restitution order. The trial court therefore abused its discretion because the restitution order is unauthorized by statute. The portion of the restitution order requiring Fink to pay $8,243.73 on count 15 and $5,358.68 on count 19 is stricken.

G. *Remand Is Required for Resentencing on Fink's Conviction on Count 16 Under the Amended Version of Section 1170, Subdivision (b)(6)*

1. *Factual background*

Fink attached to his sentencing brief a letter from his brother that described Fink's traumatic childhood experiences. The letter stated Fink grew up in a "broken household" with "an abusive father." The letter further stated Fink "was put into the system at an early age by his mother as he was (ADD & ADHD)" and Fink was "in and out of Juvenile Hall as well as Foster homes as his mother truly couldn't handle him and his biological father had abandoned him."

The trial court sentenced Fink on count 16 (§ 115, subd. (a)) to the middle term of two years, which it doubled because of the prior strike. The court explained it chose the middle term because of Fink's criminal history, the sophistication of his crimes, and his attitude toward victimizing unsuspecting individuals and corporations.

61

2. *Applicable law*

While this appeal was pending, the Governor signed into law Assembly Bill No. 124, which became effective on January 1, 2022. (Stats. 2021, ch. 695, § 5.3.) Assembly Bill. No. 124 amended section 1170 to make the lower term the presumptive sentence under certain circumstances. (Stats. 2021, ch. 695, § 5.3.) As relevant here, lower-term sentencing is presumptively appropriate where a defendant "has experienced psychological, physical, or childhood trauma" and that trauma "was a contributing factor in the commission of the offense." (§ 1170, subd. (b)(6)(A); see Cal. Rules of Court, rule 4.420(e)(1).) Where the presumption applies, the court must impose the lower term unless it "finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).) Even where the presumption does not apply because there is no evidence that the circumstances listed in paragraph (6) are present, the trial court retains discretion to impose the lower term. (§ 1170, subd. (b)(7).)

3. *The record does not clearly indicate the court would impose the same sentence under the amended section 1170*

The People concede the amendments to section 1170 apply retroactively to Fink. (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1095 (*Gerson*) [Assembly Bill No. 124 applies retroactively to nonfinal cases on direct appeal].) Nevertheless, the People assert that remand is unnecessary because the trial court's statements at sentencing demonstrate it would not have imposed the lower term on count 16. The People also contend Fink cannot

62

show he would benefit from the presumption because he did not show he suffered the requisite childhood trauma or that it contributed to his crimes. (§ 1170, subd. (b)(6).) Fink responds that unless the People meet their burden to show the record "clearly indicates" the court would reach the same sentence, remand is required.

The letter from Fink's brother suggests Fink may have suffered from childhood trauma, abuse, and abandonment. Before Assembly Bill No. 124, Fink had no reason to develop this evidence further. The court also had no reason to find that past trauma contributed to Fink's offense because there was no statutory basis to apply a lower term based on such a finding. (*Gerson*, *supra*, 80 Cal.App.5th at p. 1096; see also *People v. Banner* (2022) 77 Cal.App.5th 226, 242 ["record is likely incomplete relative to statutory factors enacted after judgment [is] pronounced"], citing *People v. Frahs* (2020) 9 Cal.5th 618, 637-638.) Nor did the trial court find there were any aggravating circumstances that would warrant a departure from the lower term. (§ 1170, subd. (b)(6) [court may depart from the lower term only if it finds "the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice"].) Because the court lacked the relevant statutory guidance, we cannot be sure the court would have found either mitigating or aggravating circumstances had the amendments been in place.

Contrary to the People's argument, there is no indication— much less a clear one—that the court would have imposed the same middle term on count 16 had Assembly Bill No. 124 been in effect at the time of sentencing. (See *Gerson*, *supra*, 80 Cal.App.5th at p. 1096.) The court's remarks at sentencing justify imposing the middle term. However, the statements

63

reveal nothing about how the court would have sentenced Fink under the lower-term presumption under the amended section 1170. Thus, based on the record and the amended section 1170, remand for resentencing is warranted. In resentencing Fink, the trial court shall account for the new legislative changes.

### H. *The Trial Court Must Reevaluate the Sentence on the Section 186.11 Enhancement*

#### 1. *Factual background*

The trial court found true the allegation under section 186.11, subdivision (a)(1)—commonly called the "aggravated white collar crime enhancement"—because Fink engaged in a pattern of criminal conduct that resulted in victim losses exceeding $100,000. The court found the economic losses of Fink's victims totaled $101,881.73. Based on the section 186.11 finding, the trial court imposed an additional one-year term of imprisonment under section 12022.6. While noting section 12022.6 had been repealed after Fink's crimes, the court cited *People v. Abrahamian* (2020) 45 Cal.App.5th 314 to support its determination that the statute still applied in Fink's case.

#### 2. *Applicable law*

Section 186.11, subdivision (a)(1), provides: "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a

64

single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3) of section 12022.6." The purpose of the aggravated white collar crime enhancement is to provide for greater punishment for those criminals who engage in a pattern of fraudulent activity that results in a larger amount of accumulated takings or victim losses. (*People v. Martinez* (2017) 10 Cal.App.5th 686, 725; *People v. Williams* (2004) 118 Cal.App.4th 735, 747.)

### 3. *Fink's arguments*

Fink asserts three challenges to the imposition of the section 186.11 enhancement. First, he claims that because the victims' total economic losses were less than $100,000, section 186.11 does not apply and the enhancement must be stricken. Second, he argues the repeal of section 12022.6 requires that we strike the enhancement. Third, Fink maintains that even if this court does not strike the enhancement, because he is entitled to resentencing for other reasons, the matter must be remanded for the trial court to reconsider the sentence on the enhancement in light of the amendment to section 1385 based on Senate Bill No. 81 (2021-2022 Reg. Sess.). As we explain, only Fink's third contention has merit.

65

4. *The reduction in the amount of restitution does not require the court to strike the section 186.11 enhancement*

Fink asserts that section 186.11, subdivision (a), no longer applies because the total victim restitution in this case is less than $100,000. As discussed, we strike the portion of the restitution order regarding counts 15 and 19, which reduces the total restitution amount to $88,279.32.

But section 186.11 does not require actual victim loss. The aggravated white collar crime enhancement is triggered by "felony conduct [that] involves the *taking of, or* results in the loss by another person or entity of more than one hundred thousand dollars ($100,000)." (§ 186.11, subd. (a)(1), italics added.) Courts have defined a "taking" as the total value of all property the defendant took through his crimes, even if the victim later recovered some or all of it or received some other compensation. (*People v. Martinez, supra*, 10 Cal.App.5th at pp. 725-726 [defining funds that the defendants returned to the victims as a "taking" under section 186.11]; accord, *People v. Frederick* (2006) 142 Cal.App.4th 400, 421 [where defendant "exercise[d] dominion and control over the funds," it was "proper to include them in calculating any excessive taking amounts," notwithstanding benefits provided in exchange, or partial recovery by police]; see *id.* at p. 422 ["'[T]he Legislature did not intend that the application of section 12022.6 should depend upon the fortuitous circumstances of whether the police were able to recover stolen property or the victim was able to establish a civil claim for the return of property or its proceeds . . . .'"].)

Here, even though the victims on counts 15 and 19 ultimately recovered their funds, the evidence shows those funds were taken from the victims' accounts at Fink's behest. On

66

count 15, the KCSD executed a levy on Fink's behalf, seized funds from the victim's account, and sent the funds to Fink's shell company, USJRU. On count 19, the LASD executed a levy on Fink's behalf and removed funds from the victim's bank account. Although the return of those funds warrants a reduction in the amount of victim restitution ordered on counts 15 and 19, section 186.11, subdivision (a), still applies because the funds were *taken* from the victims. (*People v. Martinez, supra,* 10 Cal.App.5th at pp. 725-726.)

> 5. *The repeal of section 12022.6 by operation of law does not render section 186.11 inapplicable*

Fink argues the section 186.11 enhancement is unauthorized because section 12022.6 has been repealed by operation of its sunset provision. Section 186.11, subdivision (a)(1), incorporates the sentencing terms in former section 12022.6. Section 12022.6 contained a "sunset clause," and was repealed by operation of law as of January 1, 2018 (i.e., before Fink's trial but after his crimes). (*People v. Medeiros* (2020) 46 Cal.App.5th 1142, 1147 (*Medeiros*).) According to the sunset clause, when the Legislature did not enact a successor statute by January 1, 2018, section 12022.6 was repealed. (§ 12022.6 subd. (f); Stats. 2010, ch. 711, § 5.) To date, the Legislature has not enacted a successor statute. However, section 186.11 is still in effect and continues to call for the additional punishment specified in section 12022.6.

67

a. *There is no evidence the Legislature intended to impose shorter prison terms in amending section 12022.6*

Citing *In re Estrada* (1965) 63 Cal.2d 740, 748, Fink argues that we must strike the enhancement under section 186.11. *Estrada* held that when the Legislature amends a statute to mitigate punishment and there is no saving clause, the amendment operates retroactively to impose the lighter punishment. (*Ibid.*) More recently, however, the California Supreme Court held that *Estrada* does not apply to a defendant who was convicted when a provision calling for increased punishment was still in effect and had not yet sunsetted. (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1043 (*Pedro T.*) [discussing a repealed Vehicle Code section].) Instead, courts must look to the legislative intent in assessing whether the planned repeal of a statute imposing additional penalties applies retroactively. (*Id.* at p. 1045.) An express saving clause is not necessary to preserve punishment under a repealed statute. "Rather, what *is* required is that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it." (*Id.* at pp. 1048-1049.)

In evaluating the legislative intent of the Vehicle Code section at issue, the *Pedro T.* court looked to the Legislature's statement of purpose when enacting the repealed statute. (*Pedro T., supra*, 8 Cal.4th at p. 1046.) The court also observed that "the very nature of a sunset clause, as an experiment in enhanced penalties, establishes—in the absence of evidence of a contrary legislative purpose—a legislative intent the enhanced punishment apply to offenses committed throughout its effective period." (*Id.* at p. 1049.) The court further considered the practical effect of retroactivity and concluded the Legislature did

68

not intend the planned repeal of the statute to apply retroactively. (*Id.* at pp. 1046, 1048.)

In line with *Pedro T.*, we look to section 12022.6's legislative history and language for guidance on legislative intent. The legislative history of section 12022.6 shows the Legislature intended to impose longer prison terms on a person who caused property loss above the specified threshold amounts. In amending section 12022.6, the Legislature stated: "It is the intent of the Legislature that the amendments to Section 12022.6 of the Penal Code by this act apply prospectively only and shall not be interpreted to benefit any defendant who committed any crime or received any sentence before the effective date of this act." (Stats. 2007, ch. 420, § 2; cf. *People v. Green* (2011) 197 Cal.App.4th 1485, 1489, fn. 3 [the higher monetary threshold amounts enacted in 2007 applied prospectively only].) The Legislature also considered the Assembly Floor Analysis, which stated in part, "'Penal Code Section 12022.6, enacted approximately 30 years ago on July 1, 1977, is one of California's original determinate sentencing enhancements. The excessive takings enhancements are extremely important in the prosecution of "white-collar" crime in California. Without the enhancements, the penalties for the theft or destruction of property worth $2.5 million are the same as the theft of property worth $400.'" (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1705 (2007-2008 Reg. Sess.) Sept. 5, 2007.)

The statute on its face also specified the repeal was done only so that the Legislature could revisit the enhancement amounts in light of inflation. (§ 12022.6, subd. (f).) There is also no evidence of a contrary legislative purpose to ameliorate punishment for those who steal in excess of the threshold amounts during the effective period of the statute. We cannot

infer from the sunset provision the Legislature determined a lesser punishment would serve the public interest.  (*Pedro T.*, *supra*, 8 Cal.4th at p. 1045.)  Indeed, a contrary rule would arbitrarily remove commensurate punishment for defendants whose cases happened to be pending at the time of the planned repeal and before any reenactment of section 12022.6.  That would mean the punishment applicable to someone who stole $1,000 in merchandise would also apply to situations like Fink's, in which he took over $100,000 from his victims.  That discrepancy is inconsistent with the statute's purpose and legislative history.  Indeed, "a rule that retroactively lessened the sentence imposed on an offender pursuant to a sunset clause would provide a motive for delay and manipulation in criminal proceedings." (*Pedro T.*, at pp. 1046-1047.)

> b.  *Courts have found punishment may be imposed under section 12022.6 for crimes committed before the section sunsetted*

As Fink recognizes, other appellate courts have examined whether, after the repeal of section 12022.6, punishment may be imposed under its provisions for crimes committed when the statute was in effect.  Both cases applied *Pedro T.* and concluded, as we have, that punishment may be imposed.  We agree with the reasoning and holdings of *Medeiros* and *Abrahamian*.

In *Medeiros*, *supra*, 46 Cal.App.5th at pages 1144, 1147, the defendant committed embezzlement and grand theft of property valued at over $1.3 million while section 12022.6 was in effect, but was sentenced after the statute's repeal.  On appeal, the defendant argued the court should strike the enhancement because section 12022.6 was repealed before he was sentenced.

70

(*Medeiros*, at p. 1147.)  The court rejected the defendant's argument.  It noted "[t]he plain language" of section 12022.6 "expressly declared [in subdivision (f)] that the intent of the Legislature in including a sunset provision was to allow for review of the effects of inflation on the threshold amounts applicable to the prison term enhancements." (*Medeiros*, at p. 1151.)  The court concluded it was clear "that the Legislature planned the conditional repeal as a mechanism to review the effects of inflation, not because it determined enhancements should no longer apply for excessive taking in 10 years." (*Ibid.*)  In other words, "the Legislature expressed its intent with sufficient clarity by expressly stating the purpose of the sunset provision was to review the threshold loss amounts of the enhancements, not to eliminate them." (*Ibid.*)

The *Medeiros* court found this conclusion was also consistent with the legislative history of section 12022.6.  The court concluded that the legislative history, "combined with the retention of express language in the statute regarding intent to review the threshold amounts for the effects of inflation, is persuasive evidence that the Legislature intended the sunset provision to operate as it had in the past—as an opportunity to review the loss thresholds, not as a permanent repeal of the enhancements." (*Medeiros*, *supra*, 46 Cal.App.5th at pp. 1152-1154.)  The court held the Legislature intended section 12022.6 to apply to defendants who committed their crimes before January 1, 2018.  (*Medeiros*, at p. 1157.)

In *People v. Abrahamian, supra*, 45 Cal.App.5th 314, the court also concluded that the repeal of section 12022.6 applied on a prospective basis only.  Abrahamian had been convicted of forgery and fraud offenses resulting in victim losses in excess of $200,000.  (*Abrahamian*, at p. 320.)  Among other things, she was

71

sentenced for an enhancement under former section 12022.6, which was repealed before her sentencing but was in effect when she committed her crimes. (*Abrahamian*, at pp. 320-323.) She argued that because of the repeal, the sentence had to be stricken as unauthorized by law. (*Id.* at p. 336.) The court concluded that *Pedro T.* was controlling and that Abrahamian had "failed to show that, when the sunset provision of section 12022.6 was enacted, the Legislature did not intend to apply the provision's enhanced punishment to offenses committed throughout its effective period." (*Abrahamian*, at pp. 337-338.)

Fink asserts that both cases are distinguishable and misinterpret section 186.11. He argues *Medeiros* and *Abrahamian* ignore that the sunset provision was in section 12022.6, not in section 186.11 (which incorporates section 12022.6 by reference). According to Fink, the fact that the sunset provision is in a statute that was incorporated by reference requires different rules of statutory interpretation. Fink's argument is not persuasive. "'It is a well established principle of statutory law that, where a statute adopts by specific reference the provisions of another statute, . . . the repeal of the provisions referred to does not affect the adopting statute, in the absence of a clearly expressed intention to the contrary.'" (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58-59.)

Fink also asserts *Pedro T.* is distinguishable because the Legislature did not entirely repeal the provision in that case, but instead merely directed that the older, lesser punishment go back into effect. (*Pedro T.*, *supra*, 8 Cal.4th at p. 1043.) But this is a distinction without a difference. The prospective-only repeal of the enhancement in section 12022.6 had the same effect of reducing punishment to the level it was at before the adoption of the enhancement. Further, this case, like *Pedro T.*, involves

72

additional punishment that was repealed by a sunset clause.  The *Pedro T.* court's reasoning, that "the very nature of a sunset clause, as an experiment in enhanced penalties, establishes—in the absence of evidence of a contrary legislative purpose—a legislative intent [that] the enhanced punishment apply to offenses committed throughout its effective period," applies equally here.  (*Pedro T.*, at p. 1049.)

In short, Fink's claim that the court erred in imposing a sentence under section 186.11 because section 12022.6 had been repealed under its sunset clause by the time of his sentencing lacks merit.

> 6. *The trial court must reevaluate the sentence on the section 186.11 enhancement in light of Senate Bill No. 81's amendment to section 1385*

Fink argues that, even if this court does not find an independent reason to strike the section 186.11 enhancement, if the matter is remanded for resentencing for any reason, the trial court must reevaluate the sentence on the section 186.11 enhancement in light of Senate Bill No. 81's amendment to section 1385.

We agree.  In 2021, the Legislature enacted Senate Bill No. 81, which amended section 1385 to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice.  (Stats. 2021, ch. 721, § 1.)  The People acknowledge that, after January 2022, a court sentencing on a section 186.11 enhancement would have to consider the new mitigation factors put in place by the amendment to section 1385.  (§ 1385, subd. (c)(7) [Senate Bill No. 81 "shall apply to sentencings occurring after the effective date of the act that added this

73

subdivision"]; *People v. Sek* (2022) 74 Cal.App.5th 657, 674 ["Because any resentencing in this case will take place after Senate Bill No. 81 became effective on January 1, 2022, we agree with [defendant] Sek that the court must apply the new law in any such proceeding"].)

Although Fink was sentenced before the effective date of Senate Bill No. 81, he must receive the benefit of the amendment to section 1385 for purposes of his sentence on the section 186.11 enhancement because the full sentencing rule allows the trial court to reevaluate his entire sentence on remand. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; *People v. Buycks* (2018) 5 Cal.5th 857, 893 (*Buycks*) [same].)

## DISPOSITION

The victim restitution order is vacated. On remand, the trial court is directed to strike $13,602.41 in restitution ordered on counts 15 and 19 ($8,243.73 on count 15 and $5,358.68 on count 19) and reimpose the restitution order in the amount of $88,279.32. Fink's sentences on counts 16, 54, 59, 62, and 63, and the section 186.11 enhancement are vacated. We therefore vacate Fink's entire sentence.

On remand the trial court may revisit all of its prior sentencing decisions in light of all the new legislation and our opinion. (See *People v. Valenzuela, supra*, 7 Cal.5th at pp. 424-425; *Buycks, supra*, 5 Cal.5th 857 at p. 893.) We express no opinion regarding what specific sentence the court should impose on remand.

74

Following resentencing, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

RAPHAEL, J.*

We concur:

SEGAL, Acting P. J.

FEUER, J.

---

* Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.